UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| WILLIAM J. PARDUE, | ) |
| Defendant. | ) |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendant William J. Pardue ("Pardue"):

## SUMMARY

1. This enforcement action involves Pardue's insider trading in the stock of Central Sprinkler Corp. ("Central Sprinkler"), a corporation whose offices were then located in Lansdale, Pennsylvania. Pardue was a longtime senior officer of Central Sprinkler and the son-in-law of the company's former chairman and CEO. In May 1999, he obtained material, non-public information concerning a proposed acquisition of Central Sprinkler by Tyco International, Ltd. ("Tyco"). Between May 17 and May 24, 1999 – after obtaining the material non-public information – he purchased 13,100 shares of Central Sprinkler stock for approximately $17 per share.

2. Pardue's insider trading in Central Sprinkler stock was very profitable. On June 16, 1999, Central Sprinkler announced that it was going to be acquired by Tyco for $30 per

share.  The price of Central Sprinkler stock immediately jumped 26%.  Between June 17 – the day after the announcement – and June 24, Pardue sold the Central Sprinkler stock for approximately $28 per share, realizing a profit of approximately $140,500.

3.      Through the insider trading alleged in this Complaint, Pardue engaged in fraud in the purchase and sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Accordingly, the Commission seeks: (i) entry of a permanent injunction prohibiting Pardue from further violations of Section 10(b) and Rule 10b-5; (ii) disgorgement of the profits from his insider trading, plus pre-judgment interest; and (iii) the imposition of a civil monetary penalty of up to three times the profits from his insider trading.

## JURISDICTION AND VENUE

4.      The Commission seeks a permanent injunction and disgorgement pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1].

5.      This Court has jurisdiction over this action pursuant to Sections 21, 21A and 27 of the Exchange Act [15 U.S.C. §§78u, 78u-1, 78aa].  Venue is proper in this District because Pardue resides here and the acts and practices alleged in this Complaint primarily occurred here.

6.      In connection with the conduct described in this Complaint, Pardue directly and indirectly made use of the means or instrumentality of interstate commerce or of the mails.

**DEFENDANT AND RELEVANT ENTITY**

7.     **Pardue**, age 51, is a resident of Devon, Pennsylvania.  In 1976, he married the daughter of William Meyer, then the chairman and CEO of Central Sprinkler.  In 1977, he was hired as Central Sprinkler's quality control manager.  In 1985, after a series of promotions, he became the company's executive vice president of operations.  In January 1999, he resigned as executive vice president but, pursuant to a separation agreement, he remained as an "employee/consultant" of Central Sprinkler until June 30, 1999.

8.     **Central Sprinkler** is a manufacturer of fire protection systems.  At all relevant times, its offices were located in Lansdale, Pennsylvania.  Prior to its acquisition by Tyco on August 26, 1999, its common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78k(g)] and was traded on the NASDAQ National Market System.

**STATEMENT OF FACTS**

**Pardue Obtained Material, Non-Public Information
about Tyco's Proposed Acquisition of Central Sprinkler**

9.     At all relevant times, Pardue was an insider of Central Sprinkler who had a fiduciary duty to the company's shareholders not to trade in the company's stock while in possession of material, non-public information about the company.  In addition, Pardue was covered by Central Sprinkler's corporate policy prohibiting all directors, executive officers and related persons from trading in the company's stock while in possession of material, non-public information.

10. At all relevant times, Pardue had a duty of confidentiality to William Meyer, who is Pardue's father-in-law. Meyer purchased control of Central Sprinkler in the early 1970s and was the company's president and CEO until his retirement in 1995. Meyer was also the chairman of the board of directors until November 1997, a voting member of the board until January 1999, and then a non-voting member of the board on senior emeritus status. Meyer hired Pardue in 1977 as Central Sprinkler's quality control manager. Pardue was promoted in 1985 to executive vice president of operations. In that position, he reported directly to Meyer, functioned as Meyer's right-hand man, and routinely received material non-public information about Central Sprinkler from Meyer and kept that information confidential. Pardue thus owed a duty of confidentiality to Meyer, and that duty continued after Pardue became an employee/consultant of Central Sprinkler in January 1999 because of Pardue's status as Meyer's son-in-law and because Meyer continued to share with him material non-public information about Central Sprinkler that Pardue kept confidential.

11. In late March 1999, an investment bank informed E. Talbott Briddell, Central Sprinkler's chairman and CEO, that Tyco was interested in acquiring the company. On April 15, 1999, Tyco executed a confidentiality agreement with Central Sprinkler, and Central Sprinkler thereafter provided Tyco with certain confidential financial information. On April 29, 1999, Tyco told Central Sprinkler that it was willing to acquire the company for $28 per share of its common stock. On May 5, 1999, Tyco's offer of $28 per share was communicated to Central Sprinkler's board of directors, and the board engaged the investment bank to contact other potential buyers via an auction process. On May 14, 1999, Tyco raised its offer to $30 per share

at a meeting with Central Sprinkler's senior management. On June 14, 1999, the Central Sprinkler board unanimously approved the acquisition by Tyco at $30 per share.

12. At all relevant times in 1999, William Meyer's sons George and Stephen were members of Central Sprinkler's board of directors. In addition, George Meyer was the company's president and Stephen Meyer was its executive vice president of research and development. George and Stephen Meyer were aware of all significant steps in the negotiations with Tyco. They spoke with their father, William Meyer, regularly during this period and kept him informed about the status of the negotiations. Indeed, the negotiations were a subject of considerable interest among the Meyer family because their substantial equity interest in Central Sprinkler would be liquidated if Tyco's offer were accepted.

13. Pardue visited William Meyer and his wife frequently from March through May 1999, including a two-week period when he visited every night. George and Stephen Meyer also visited their parent's home often during this period. It appears that Pardue learned about Tyco's impending acquisition of Central Sprinkler during these visits to William Meyer's home. Indeed, Pardue admitted during the Commission's investigation that he may have discussed Central Sprinkler with William Meyer during his visits to Meyer's home in this period.

**Pardue Bought and Sold Central Sprinkler Stock for a Large Profit**

14. On May 17, 1999 – three days after Tyco presented its $30 per share offer to Central Sprinkler's board – Pardue purchased 1,300 shares of Central Sprinkler stock. He then purchased 2,000 shares on May 18, 6,000 shares on May 20, and 3,800 shares on May 24. Altogether, between May 17 and May 24, 1999, Pardue purchased 13,100 shares of Central Sprinkler stock for a total purchase price of approximately $226,325, or approximately $17 per

share.  In order to pay for his purchases of Central Sprinkler stock, he sold all his holdings of other stocks for approximately $228,726.

15. Before the stock market opened on June 16, 1999, Central Sprinkler announced that its board had accepted Tyco's offer to purchase the company for $30 per share.  That day, the price of Central Sprinkler stock rose 26% – from $22.375 per share to $28.1875 per share.  The stock price remained at approximately the same level for the next several weeks.

16. Between June 17 – the day after the announcement – and June 24, 1999, Pardue sold his entire holdings of Central Sprinkler stock for approximately $28 per share.  His profit on the shares purchased between May 17 and May 24, 1999 was approximately $140,500.

**Pardue's Misleading and Implausible Explanations
for his Purchase of Central Sprinkler Stock**

17. In sworn testimony during the Commission's investigation, Pardue offered various misleading and implausible explanations for his purchase of Central Sprinkler stock in mid-May 1999.  He first testified that he bought the stock simply because he "thought it was going to go up."  When asked to identify the information which had led him to that conclusion, he testified that in mid-April 1999 the company had announced positive results for the previous quarter.  However, Central Sprinkler did not release its quarterly results until May 27, 1999 – ten days *after* Pardue started buying Central Sprinkler stock.

18. Pardue also testified that one reason for his purchase of Central Sprinkler stock in mid-May 1999 was that the company had reached a favorable settlement of a lawsuit brought by the Consumer Product Safety Commission ("CPSC") concerning a defective product.  However, the CPSC settlement took place in October 1998, and Pardue purchased 8,000 shares of Central

Sprinkler stock in December 1998. He could not explain why he waited until May 1999 – five months later – before buying more Central Sprinkler stock supposedly in response to the CPSC settlement. Further, Pardue's alleged reliance on the CPSC settlement in October 1998 as a reason for buying Central Sprinkler stock in mid-May 1999 is inherently implausible given that he *sold* approximately one-half his holdings of Central Sprinkler stock (16,000 shares) in mid-March 1999 because, as he testified to the Commission, he believed at the time that the price was not going to rise any further.

19.     Pardue also testified that one reason for his purchase of Central Sprinkler stock in mid-May 1999 was a conversation in 1998 with someone who told him that Briddell, Central Sprinkler's chairman and CEO, "doesn't build assets, but disposes of them," and that another reason was that Briddell himself purchased 100,000 shares of Central Sprinkler stock in February 1999. However, Pardue could not explain why he waited until May 1999 before buying Central Sprinkler stock in response to a conversation that supposedly occurred in 1998 or in response to Briddell's purchase in February 1999. Further, Pardue's alleged reliance on a conversation about Briddell in 1998 and on Briddell's purchase of Central Sprinkler stock in February 1999 as reasons for buying Central Sprinkler stock in mid-May 1999 is inherently implausible given that, as noted above, he *sold* approximately one-half his holdings of Central Sprinkler stock in mid-March 1999.

20.     Pardue also testified that one reason for his purchase of Central Sprinkler stock in mid-May 1999 was that the price had climbed from $12 per share to $17 per share. However, the price of Central Sprinkler stock reached $17 per share in April 1999 – nearly one month *before* Pardue began buying the stock on May 17, 1999. Indeed, the price remained level at

approximately $17 per share for the month preceding Pardue's purchase on May 17, 1999. Similarly, Pardue testified that another reason for his purchase of Central Sprinkler stock in mid-May 1999 was that Central Sprinkler had hired a new CFO. However, the hiring announcement was made on April 19, 1999 – nearly one month *before* Pardue began buying Central Sprinkler stock.

21. Pardue also testified that he purchased Central Sprinkler stock in mid-May 1999 in order to diversify his personal stock portfolio. However, he actually liquidated his entire portfolio of other stocks in order to generate the funds needed to purchase the additional shares of Central Sprinkler stock in mid-May 1999.

22. Besides the fact that Pardue offered a variety of implausible explanations for his purchase of Central Sprinkler stock in mid-May 1999, two other factors support an inference that Pardue actually purchased the stock because he had just obtained inside information about the proposed acquisition by Tyco. First, he was experiencing significant financial pressures at the time – he had lost his job and he faced substantial mortgage expenses and tuition costs (he has six children, three of whom were already in college or private schools). Second, the amount he spent – more than $226,000 – was more than twice as much as he had ever previously spent to purchase a stock, and most of his prior stock purchases were in the range of $25,000 to $50,000.

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

23. The Commission repeats and incorporates by reference the allegations in paragraphs 1-22 of the Complaint as if set forth fully herein.

24. As set forth above, Pardue obtained material non-public information about Central Sprinkler and then, in breach of his duties of confidentiality to William Meyer and Central Sprinkler, bought and sold Central Sprinkler stock for his personal profit.

25. By reason of the foregoing, Pardue, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of Central Sprinkler stock.

26. As a result, Pardue violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Pardue and each of his agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

B. Require Pardue to disgorge the profits from his insider trading, plus pre-judgment interest;

    C.    Order Pardue to pay a civil monetary penalty of up to three times the amount of the profits from his insider trading, pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

    D.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

    E.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____

Juan Marcel Marcelino
District Administrator

Frank C. Huntington (Mass. Bar No. 544045)
Senior Trial Counsel

David H. London (Mass. Bar No. 638289)
Senior Enforcement Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5900  ext. 201 (Huntington)
              ext. 667 (London)
(617) 424-5940  fax

Dated:   October 23, 2002